United States District Court
Southern District of Texas
**ENTERED**
March 29, 2019
David J. Bradley, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION**

| | | |
|---|---|---|
| LUZIA NAMBISSE DA SILVA, | § | |
| | § | |
| **Petitioner,** | § | |
| VS. | § | **MISC. ACTION NO. 5:18-MC-00932** |
| | § | |
| KIRSTJEN NIELSEN, *et al.*, | § | |
| | § | |
| **Defendant & Respondents.** | § | |

## MEMORANDUM & ORDER

Petitioner is an Angolan asylum-seeker who has been in immigration detention since her arrival at the Laredo port of entry in March of 2018. An immigration judge denied her asylum application in October of 2018, and Petitioner has appealed to the Board of Immigration Appeals. Petitioner filed this habeas action seeking release from detention during the pendency of her appellate proceedings. Having considered the parties' filings and the applicable law, the Court concludes that Petitioner's detention has become unreasonably prolonged in violation of her due process rights. Although the Court will not order Petitioner's immediate release, it will require Respondents to accord her an individualized bond hearing before an immigration judge within fourteen days of the issuance of this Order.

### Factual Background

Petitioner Luzia Nambisse da Silva is a citizen of Angola who lacks authorization to enter the United States. (Dkt. 2 at 3; *see* Dkt. 3, Attach. 7.) She arrived at the U.S.-Mexico border on March 21, 2018 and sought admission at the Laredo, Texas port of entry. (Dkt. 2 at 9.) Petitioner stated her intent to apply for asylum and was placed in Immigration and Customs Enforcement (ICE) custody. (*Id.*) After conducting a credible fear interview (CFI) on April 9, 2018, a Department of Homeland Security (DHS) asylum officer concluded that Petitioner had

established a credible fear of persecution based on events that had transpired in Angola. (Dkt. 3, Attach. 3.)

Specifically, Petitioner stated that Mama Africa, a criminal gang with close ties to Angolan government officials, murdered her father, mother, and brother in 1998 after her father, a high-ranking police commissioner, reported an illegal arms sale directly implicating the government. (Dkt. 2 at 8; Dkt. 3, Attach. 2 at 4–7.) The following year, the same criminal organization allegedly abducted, and presumably murdered, her sister. (Dkt. 2 at 8.) Petitioner stated that she has attempted to avoid Angola since then by living for stints in Panama, Colombia, and Ecuador. (Dkt. 3, Attach. 2 at 7; *see* Dkt. 3, Attach. 15 at 3.)

Even so, Petitioner has been personally targeted by the gang at least three times. In 2008, unknown assailants fired bullets into her home in Angola. (Dkt. 2 at 8; *see* Dkt. 3, Attach. 18 at 1.) In 2016, while Petitioner was living in Ecuador, gang members held her at gunpoint and threatened her. (Dkt. 2 at 8.) In 2017, after she had returned to Angola, the organization burned down her home and left a threatening note. (*Id.* at 8–9; *see* Dkt. 3, Attach. 18 at 1.) She believes the gang continues to target her "for revenge and for . . . documents" she possesses listing the "names of people who were receiving money" and "participating in the corruption and arms trade." (Dkt. 3, Attach. 2 at 6.) Moreover, it appears to Petitioner that the Angolan government and police are working in concert with the gang to keep Petitioner out of Angola and prevent the release of the documents. (*Id.* at 6–8.)

Following the 2017 home arson, Petitioner recounted, she sought refuge with a group of nuns. (Dkt. 2 at 9.) However, the nuns blamed Petitioner for the crimes committed against her and told her "that everything that happened was [her] fault because [she] was not a virgin anymore." (Dkt. 3, Attach. 2 at 5; *see* Dkt. 2 at 9.) On approximately nine occasions, the nuns

physically assaulted her by burning her with a hot fork "between [her] legs."[1] (Dkt. 3, Attach. 2 at 5; *see* Dkt. 2 at 9.) In November of 2017, Petitioner fled the nuns and began her journey to the United States.[2] (Dkt. 3, Attach. 2 at 4.)

Upon hearing Petitioner's account, the asylum officer found that she had shown a credible fear of persecution based on her membership in a particular social group—one of the categories of persecution protected under U.S. asylum law. (Dkt. 3, Attach. 3 at 4.) *See* 8 U.S.C. § 1158(b)(1)(B). Petitioner sought parole from ICE custody pending the outcome of her asylum proceeding, but, following an interview on May 4, 2018, ICE declined to grant her parole on the grounds that she had not established her identity or proven she was not a flight risk.[3] (Dkt. 3, Attach. 6; *see* Dkt. 3, Attach. 5.) Several weeks later, Petitioner received a Notice to Appear in immigration court for removal proceedings. (Dkt. 3, Attach. 4.) Petitioner applied for asylum and obtained legal representation from the University of Texas School of Law Immigration Clinic. (Dkt. 2 at 11.)

Petitioner's final immigration court hearing took place by video teleconference on October 2, 2018. (*Id.*; *see* Dkt. 3, Attach. 15 at 2–6.) The evidence presented at the hearing

---

[1] In her CFI and asylum application, Petitioner also reported that she was a victim of domestic abuse in Angola from 2000 to 2005. (Dkt. 3, Attach. 2 at 9–10, Attach. 7 at 4–6.) However, her habeas petition implies that she is seeking asylum based only on her persecution by Mama Africa and abuse by the nuns, presumably because asylum is typically not available on the basis of family violence. (Dkt. 2 at 3–4, 8–9.) *See Arevalo-Velasquez v. Whitaker*, 752 F. App'x 200, 201–02 (5th Cir. 2019) (per curiam); *Lemus v. Lynch*, 611 F. App'x 813, 815–16 (5th Cir. 2015) (per curiam).

[2] Although it is unclear by what route Petitioner reached the United States, it appears that she left Angola by boat and disembarked first in South Africa, then in South America, before traveling northward by land with a group of fellow African asylum-seekers. (Dkt. 3, Attach. 2 at 3–4, 8–9.) In her CFI, Petitioner stated that her journey had taken approximately four months and spanned ten countries. (*Id.* at 3–4.)

[3] Petitioner's attorneys have since filed two renewed requests for parole, both of which have been denied, apparently without explanation. (Dkts. 16, 20; *see* Dkt. 18 at 4, 9.)

included Petitioner's testimony, medical reports documenting Petitioner's mental and physical deterioration while in custody, and expert documents supporting her application. (*See* Dkt. 2 at 11; Dkt. 3, Attach. 15 at 4–6, Attach. 18 at 4–5.) A psychologist and professor who conducted an extensive interview of Petitioner in September of 2018 noted that she displayed multiple symptoms of post-traumatic stress disorder, including depression, sleep disruptions, and heart palpitations. (Dkt. 3, Attach. 11 at 2.) In the psychologist's opinion, the "nature of [Petitioner's] symptoms is such that she would suffer serious emotional setbacks if she were not granted asylum."[4] (*Id.* at 11; *see* Dkt. 3, Attach. 23 at 27–30.) A physician who conducted a physical exam of Petitioner found scars on her inner thighs corroborating her account of physical abuse at the hands of the nuns in Angola. (Dkt. 3, Attach. 13 at 2–3.)

On October 11, 2018, the immigration judge (IJ) denied Petitioner's asylum application. (Dkt. 3, Attach. 15.) Although the IJ found Petitioner credible and acknowledged that she had been targeted because of her father's political affiliation, he concluded that the threats she had received did not rise to the level of persecution.[5] (*Id.* at 6–13.) The IJ further found that Petitioner had not demonstrated an objective basis for fearing future persecution in Angola. (*Id.* at 12–13.) On November 1, 2018, Petitioner filed a timely notice of appeal with the Board of Immigration Appeals (BIA). (Dkt. 3, Attach. 17 at 4.) On appeal, she contends that the IJ erred in weighing the facts and misapplied Fifth Circuit precedent. (Dkt. 2 at 12; *see* Dkt. 22, Attach. 1 at

---

[4] After conducting a second evaluation in December of 2018, the psychologist reported that Petitioner's "condition has worsened since her first evaluation in September." (Dkt. 3, Attach. 23 at 31.) The updated exam report documented severe PTSD symptoms exacerbated by the conditions of Petitioner's confinement. (*Id.* at 32–33.)

[5] The IJ also considered whether Petitioner's nuclear family might constitute a "particular social group" for asylum purposes. (Dkt. 3, Attach. 15 at 3.) However, he did not decide the issue, reasoning that Petitioner's failure to show past persecution and a well-founded fear of future persecution would defeat her claim for asylum on *any* ground. (*Id.*)

6–23.) The BIA set a February 15, 2019 briefing deadline for both Petitioner and DHS. (Dkt. 18 at 4–5.) Should Petitioner lose before the BIA, she intends to seek further review from the Fifth Circuit, a process her attorneys estimate "would likely take another eighteen months to conclude." (Dkt. 2 at 12.)

Petitioner has now been in ICE custody for just over one year. (Dkt. 2 at 9, 13.) In December of 2018, she filed this habeas petition seeking release on bond until the conclusion of her appellate proceedings. (*Id.* at 1, 13.) Petitioner first argues that her indefinite detention violates the substantive element of the Fifth Amendment's Due Process Clause, which she claims "prohibits prolonged pre-removal detention of an immigrant unless it is based on a sufficiently legitimate government interest." (*Id.* at 20.) Here, Petitioner alleges, ICE has no legitimate reason to keep her in custody. (*Id.* at 17–18; *see* Dkt. 18 at 10–11.) Rather, ICE "continues to detain [her] to generally deter potential migrants from Central America," not because it has any concerns about Petitioner's identity, risk of flight, or threat to the community. (Dkt 2. at 19.) Petitioner points out that ICE has stipulated to her identity, that a sponsor in Austin has agreed to support her if she is paroled,[6] and that she has no criminal history. (Dkt. 2 at 2; Dkt. 18 at 2–4.)

Petitioner also alleges a violation of her procedural due process rights. (Dkt. 2 at 22.) She contends that the Fifth Amendment entitles civil detainees "to an evidentiary review hearing, with procedural protections, in front of a neutral arbiter, to ensure that a detention decision comports with the strict constitutional standards limiting deprivations of liberty in the absence of

---

[6] Casa Marianella, a shelter for refugees, asylum-seekers, and asylees, has agreed to provide Petitioner with "housing, case management, transportation, and other supportive services," including medical care. (Dkt. 3, Attach. 19 at 3.) If Petitioner is paroled, her Casa Marianella case manager will closely monitor her behavior, assist her in accessing legal and medical services, and "ensur[e] that [she] can and does attend ICE appointments and court dates." (Dkt. 3, Attach. 8 at 1.) Casa Marianella staff conducted a "strict screening process" before agreeing to sponsor Petitioner and found that Petitioner "clearly meets all of [their] criteria" for admission to the shelter. (*Id.*)

a criminal conviction." (*Id.*; *see* Dkt. 18 at 10–11.) In Petitioner's view, Respondents' position that the arriving-alien regulations preclude "immigration court review of a DHS custody determination" violates the Fifth Amendment's guarantee of "an individualized determination of the need for detention." (Dkt. 2 at 16–17.)

Respondents have moved to dismiss Petitioner's habeas petition for lack of subject-matter jurisdiction and failure to state a claim upon which relief may be granted. (Dkt. 17 at 1.) *See* Fed. R. Civ. P. 12(b)(1), 12(b)(6). Respondents contend that federal immigration law bars judicial review of DHS parole decisions. (Dkt. 17 at 12.) In the alternative, Respondents argue that Petitioner has failed to state a claim because her allegations do not "rise to the standard of a due process violation." (Dkt. 17 at 13.) They point out that Petitioner has presented no evidence to support the claim that she is being detained as part of a general deterrence effort, nor has she demonstrated that the Government acted egregiously or maliciously at any point in her proceedings. (*Id.* at 15–16.) In Respondents' view, Petitioner is merely unhappy with DHS's discretionary decision not to grant her parole. (*Id.* at 16.) Finally, Respondents argue that only Orlando Perez, the warden of the facility where Petitioner is being detained, is a proper respondent. (*Id.* at 18.) They therefore seek to dismiss Respondents Nielsen, Cerna, Bible, Vitiello, and Whitaker as parties to the case. (*Id.* at 19.)

**Discussion**

## A.    Subject-Matter Jurisdiction

### 1.    Legal Standard

The primary federal habeas corpus statute confers federal subject-matter jurisdiction over habeas petitions filed by aliens who claim they are being detained "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3); *Zadvydas v. Davis*,

533 U.S. 678, 687 (2001). However, the REAL ID Act of 2005 divested federal courts of jurisdiction over several important categories of immigration cases. *See* Pub. L. No. 109-13, Div. B, 119 Stat. 231 (2005). Specifically, regardless of the federal habeas statute, district courts may not review challenges to final orders of removal. 8 U.S.C. § 1252(a)(5); *Moreira v. Mukasey*, 509 F.3d 709, 712 (5th Cir. 2007). Moreover, no federal court may review any action that is committed to the discretion of the Attorney General or the DHS Secretary, 8 U.S.C. § 1252(a)(2)(B)(ii), including decisions "regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole," 8 U.S.C. § 1226(e).

The Supreme Court has recognized a distinction between challenges to individual, discretionary detention decisions—which are prohibited—and "challenges to the statutory framework that permits [an] alien's detention without bail"—which remain cognizable under the habeas statute. *Jennings v. Rodriguez*, 138 S. Ct. 830, 841 (2018) (internal alterations omitted) (citing *Demore v. Kim*, 538 U.S. 510, 516 (2003)); *see also Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 135 (D.D.C. 2018) ("While § 1252(a)(2)(B)(ii) undoubtedly bars judicial review of individual parole decisions, courts have declined to apply it to claims challenging the legality of policies and processes governing discretionary decisions under the INA.").

Despite any statutory limitations on judicial review, that is, federal courts retain "jurisdiction to review [an alien's] detention insofar as that detention presents constitutional issues," *Oyelude v. Chertoff*, 125 F. App'x 543, 546 (5th Cir. 2005), such as "questions of law regarding the AG's statutory authority or the regulatory framework" governing immigration detention, *Garza-Garcia v. Moore*, 539 F. Supp. 2d 899, 903 (S.D. Tex. 2007); *see also Maldonado v. Macias*, 150 F. Supp. 3d 788, 794 (W.D. Tex. 2015) ("[E]ven after the passage of the REAL ID Act, district courts retain the power to hear statutory and constitutional challenges

to civil immigration detention under § 2241 when those claims do not challenge a final order of removal, but instead challenge the detention itself.").

### 2.    Analysis

Respondents argue that the Court lacks subject-matter jurisdiction over this case because Petitioner "is not challenging the constitutionality of the Attorney General's authority to make a decision regarding her parole" but rather "is claiming that she deserves to be paroled because of her circumstances." (Dkt. 17 at 12.) *See* 8 U.S.C. § 1252(a)(2)(B)(ii); 8 U.S.C. § 1226(e). In other words, Petitioner has no quarrel with the law itself; she simply seeks a favorable application of that law to her individual case.

The Court disagrees. Petitioner does not merely seek a redetermination of her parole request under Respondents' existing reading of the law. Rather, her challenge raises constitutional questions about the civil-detention laws themselves and the extent of DHS's discretion under them. (Dkt. 2 at 20–23; *see* Dkt. 18 at 10–11.) Petitioner's claims are just the sort of "constitutional challenges to continued detention" that the REAL ID Act preserved for judicial review. *Alexis v. Sessions*, 2018 WL 5921017, at *4 (S.D. Tex. Nov. 13, 2018); *see Demore*, 538 U.S. at 517 ("Section 1226(e) contains no explicit provision barring habeas review, and we think that its clear text does not bar respondent's constitutional challenge to the legislation authorizing his detention without bail.").

In fact, the Supreme Court recently held in a closely analogous case that federal courts retain jurisdiction over as-applied Due Process Clause challenges like Petitioner's. *Rodriguez*, 138 S. Ct. at 841. In *Rodriguez*, a class of asylum-seekers raised precisely the same argument Petitioner raises here: that the relevant civil-detention statute "do[es] not authorize prolonged detention in the absence of an individualized bond hearing." *Id.* at 839 (internal quotation marks

omitted). (*See* Dkt. 2 at 20–23.) Just like this Petitioner, the *Rodriguez* petitioners sought individualized bond determinations on the basis that any reading of the detention statute that does not include "a bond-hearing requirement . . . would violate the Due Process Clause of the Fifth Amendment."[7] 138 S. Ct. at 839. Because this claim constitutes a "challenge[] to the statutory framework" and "the extent of the Government's detention authority"—not merely a grievance regarding an individual parole denial—the Court held that it is not barred by the statutory prohibition against judicial review of discretionary agency decisions.[8] *Id.* at 841.

*Rodriguez* plainly forecloses Respondents' jurisdictional objections. In fact, *Rodriguez*'s jurisdictional holding was so clear that, in its wake, it appears Government respondents in analogous cases have abandoned jurisdictional arguments altogether. *See, e.g.*, *Perez v. Decker*, 2018 WL 3991497, at *3 (S.D.N.Y. Aug. 20, 2018); *Otis V. v. Green*, 2018 WL 3302997, at *2 (D.N.J. July 5, 2018). Thus, given the Supreme Court's authorization of as-applied due process challenges to immigration detention, the Court has subject-matter jurisdiction over this case and may consider the merits of Petitioner's claims. Thus, Respondents' motion to dismiss for lack of subject-matter jurisdiction will be denied. (Dkt. 17 at 7.)

---

[7] Unfortunately, the *Rodriguez* Court did not resolve this claim. As to the class of asylum-seekers, it held only that the statutory provision governing the detention of arriving aliens does not contain any implied reasonableness limitation on the length of detention. 138 S. Ct. at 842–44; *see* 8 U.S.C. §§ 1225(b)(1)–(2). The Supreme Court ultimately remanded the *Rodriguez* petitioners' constitutional claims because the court of appeals had not considered them on their merits. 138 S. Ct. at 851. Petitioner's Due Process Clause claims therefore remain open to dispute. Given *Rodriguez*'s holding, Petitioner does not raise a statutory claim here. *See Pierre v. Doll*, 350 F. Supp. 3d 327, 330 (M.D. Pa. 2018) ("To the extent that Petitioner argues that he is statutorily entitled to periodic bond hearings under § 1225(b), [*Jennings v. Rodriguez*] squarely rejected such a reading of the statute.").

[8] In addition to 8 U.S.C. Section 1226(e), the Supreme Court also rejected the argument that federal jurisdiction was extinguished by 8 U.S.C. Section 1252(b)(9), a provision of the REAL ID Act that confines judicial review of actions "arising from" removal proceedings to cases in which a final removal order has been entered. *Rodriguez*, 138 S. Ct. at 840–41. Respondents have not raised a Section 1252(b)(9) argument in this case.

**B.    Motion to Dismiss Non-Warden Respondents**

**1.    Legal Standard**

The federal habeas statute provides that the proper respondent to a habeas petition is "the person who has custody over [the petitioner]." 28 U.S.C. § 2242; *see also* 28 U.S.C. § 2243 ("The writ, or order to show cause shall be directed to the person having custody of the person detained."). As the Supreme Court has noted, "[t]he consistent use of the definite article in reference to the custodian indicates that there is generally only one proper respondent to a given prisoner's habeas petition." *Rumsfeld v. Padilla*, 542 U.S. 426, 434 (2004). Accordingly, "the default rule is that the proper respondent is the warden of the facility where the prisoner is being held, not the Attorney General or some other remote supervisory official." *Id.* at 435.

The Supreme Court has recognized only two exceptions to this immediate custodian rule. The first exception applies "in the military context where an American citizen is detained outside the territorial jurisdiction of any district court." *Id.* at 436 n.9. In such cases, petitioners have been permitted to name high-level officials such as the Secretary of the Air Force and the Secretary of Defense as respondents. *See, e.g.*, *United States ex rel. Toth v. Quarles*, 350 U.S. 11, 25 (1955); *Burns v. Wilson*, 346 U.S. 137, 139 (1953). Second, "the immediate physical custodian rule, by its terms, does not apply when a habeas petitioner challenges something other than his present physical confinement." *Padilla*, 542 U.S. at 438. Instead, he "may name as respondent the entity or person who exercises legal control with respect to the challenged 'custody.'" *Id.*; *see, e.g.*, *Braden v. 30th Judicial Circuit Court of Ky.*, 410 U.S. 484, 494–95 (1973); *Strait v. Laird*, 406 U.S. 341, 344 (1972).

The Supreme Court has not recognized an immigration-related exception to the immediate custodian rule. Rather, the *Padilla* Court expressly "left open the question whether

the Attorney General is a proper respondent to a habeas petition filed by an alien detained pending deportation." 542 U.S. at 435 n.8. Following *Padilla*, the vast majority of lower courts—including courts within this District—have continued to apply the immediate custodian rule in immigration habeas cases. *See, e.g.*, *Bonitto v. Bureau of Immigration & Customs Enf't*, 547 F. Supp. 2d 747, 751 (S.D. Tex. 2008) ("[T]he proper Respondent is the warden of the facility at which Petitioner is detained."); *Thanh Ngo v. Siegl*, 2018 WL 2215889, at *3 (S.D. Tex. May 15, 2018) ("[T]he prisoner's physical custodian, and no other official of the government agency under whose authority the prisoner is held, is the only proper respondent in a section 2241 petition."); *see also Chukwu v. Price*, 2017 WL 8728592, at *3 (W.D. Tex. Aug. 24, 2017) ("[T]he proper respondent in this case is [the official who] directly supervises the facility where Petitioner is detained and maintains immediate custody over Petitioner's person.").

### 2.    Analysis

Citing *Padilla*, Respondents argue that Orlando Perez, the warden of the detention center at which Petitioner is presently housed, is the only proper respondent. (Dkt. 17 at 18.) They therefore seek to dismiss all other parties named by Petitioner: Secretary of Homeland Security Kirstjen Nielsen, ICE Field Office Director Daniel Bible, ICE Assistant Field Office Director Robert Cerna, ICE Acting Director Ronald Vitiello, and former Acting Attorney General Matthew Whitaker. (*Id.*) Petitioner, on the other hand, urges the Court to apply something closer to the "legal control" test. (Dkt. 18 at 18–19.) Because "Respondents have transferred [Petitioner], without notice, between the Hutto and Laredo detention centers . . . and may do so again," Petitioner argues, she should be permitted to name all officials in the chain of command. (*Id.* at 19.)

Petitioner cites two cases in which the Western District of Texas permitted immigration

detainees to name multiple agency officials as habeas respondents. (*Id.* at 19.) *See Gutierrez-Soto v. Sessions*, 317 F. Supp. 3d 917, 927 (W.D. Tex. 2018); *Davis v. Gonzales*, 482 F. Supp. 2d 796, 799 (W.D. Tex. 2006). However, as discussed above, these two cases represent the minority position among district courts that have addressed the identity of proper respondents in immigration habeas cases. Moreover, neither Petitioner nor the Western District cases she cites offer a compelling justification for departing from the well-established default rule that the warden with immediate custody of Petitioner is the only proper respondent. *Padilla*, 542 U.S. at 434; *see Srithayaparan v. Venturella*, 2008 WL 11399489, at *2 (S.D. Tex. May 13, 2008). Instead, these decisions simply emphasize that the Supreme Court has not foreclosed the *possibility* of an exception to the immediate custodian rule for immigration detainees. *See Gutierrez-Soto*, 317 F. Supp. 3d at 927; *Davis*, 482 F. Supp. 2d at 799.

Finally, Petitioner argues that supervisory officials must be included as respondents because Petitioner could eventually be transferred to a different facility with a different warden, rendering the warden of her current facility obsolete as a respondent. (Dkt. 18 at 19.) The possibility of transfer, however, is no more characteristic of immigration detention than any other form of custody. Thus, the Court is of the view that "there is no basis to depart from *Padilla*'s clear directive." *Alexis*, 2018 WL 5921017, at *4. Rather, in the event that Petitioner is moved to another detention facility, the Court will grant her leave to amend her petition to name the new facility's warden. In the meantime, the claims against Nielsen, Bible, Cerna, Vitiello, and Whitaker[9] will be dismissed "because they are remote supervisory officials,

---

[9] The Court takes judicial notice of the fact that Respondent Whitaker is no longer the Acting Attorney General. The Court's dismissal applies equally to the current Attorney General, William Barr, and any successor who may assume the office during the pendency of this litigation.

not [Petitioner's] custodian." *Id.* (internal alterations and quotation marks omitted).

**C.    Detention of Arriving Aliens: The Statutory and Constitutional Framework**

   **1.    Legal Standards**

        *a.  Federal Rule of Civil Procedure 12(b)(6)*

A civil claim may be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it does

not contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007). While the complaint need not contain detailed factual

allegations, it must set forth "more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citation omitted).

Rather, the complaint's "[f]actual allegations must be enough to raise a right to relief above the

speculative level." *Id*. While all well-pleaded facts in the complaint are to be accepted as true,

legal conclusions "are not entitled to the assumption of truth," *Ashcroft v. Iqbal*, 556 U.S. 662,

679 (2009) (citation omitted), nor should a court strain to make unwarranted inferences favorable

to the petitioner, *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005).

        *b.  Section 1225: No Statutory Limitation on Length of Detention*

The inspection and detention of arriving aliens are governed by 8 U.S.C. Section

1225(b)(1). *See Akhtar v. Gonzales*, 450 F.3d 587, 590–91 (5th Cir. 2006) (explaining the

historical development of the "arriving alien" category in immigration law). By regulation, the

term "arriving alien" includes, among others, any "applicant for admission coming or attempting

to come into the United States at a port-of-entry."[10] 8 C.F.R. § 1.2. When such an alien arrives at

---

        [10]  In her initial habeas petition, Petitioner appeared to agree with DHS that she is an
arriving alien subject to mandatory detention under 8 U.S.C. Section 1225(b)(1). (Dkt. 2 at 16;
Dkt. 17 at 8.) In fact, Petitioner acknowledged that "individuals who present themselves at a port
of entry to seek asylum, like [herself], are considered 'arriving aliens' and have no right under
current regulations to seek immigration court review of a DHS custody determination." (Dkt. 2 at

the border, she is first inspected by a Customs and Border Patrol (CBP) agent. 8 U.S.C. § 1225(b)(1)(A)(i). If she does not have valid entry or travel documents, the officer must order her removed without a hearing or further review. *Id.* If, however, she indicates an intention to apply for asylum or a fear of persecution, an asylum officer must interview her to determine whether she has "a credible fear of persecution" in her home country. *Id.* § 1225(b)(1)(B)(ii). If she receives a positive credible-fear determination, the alien "shall be detained for further consideration of the application for asylum." *Id.*

By statute, detention of aliens with pending asylum applications is mandatory. *Rodriguez*, 138 S. Ct. at 842. As *Rodriguez* made clear, the statute imposes no limit on the length of detention, nor does it authorize individualized bond determinations. *Id.* at 842–43; *see Pierre*, 350 F. Supp. 3d at 330–31. In fact, an alien detained during asylum proceedings may be temporarily released on parole only "for urgent humanitarian reasons or significant public benefit," 8 U.S.C. § 1182(d)(5)(A)—and then only if she presents "neither a security risk nor a risk of absconding," 8 C.F.R. § 212.5(b); *see Rodriguez*, 138 S. Ct. at 837.[11] Parole decisions under Section 1182 are purely discretionary, and the regulations bar immigration judges from

---

16.) In her response to Respondents' motion to dismiss, however, Petitioner suggests that she might instead fall within 8 U.S.C. Section 1226(a)'s provisions for the detention of other aliens in removal proceedings. (Dkt. 18 at 5.) However, she claims that the Court "need not decide which statute applies . . . in order to resolve [Petitioner's] constitutional claims." (*Id.*) In fact, the Court *cannot* decide which statute applies. Under the REAL ID Act, district courts have "no jurisdiction to review determinations of fact or law directly related to [a petitioner's] removal" proceedings. *Otis V.*, 2018 WL 3302997, at *3; *see* 8 U.S.C. § 1252(a)(5). In this case, the denial of Petitioner's asylum application is directly related to the IJ's factual finding that she is an arriving alien not entitled to admission. *See* 8 U.S.C. § 1225(b). The Court must accept that determination for the purposes of this Order.

[11] DHS regulations enumerate the groups of aliens for whom parole is generally "justified . . . on a case-by-case basis for 'urgent humanitarian reasons' or 'significant public benefit.'" 8 C.F.R. § 212.5(b). Two of those categories appear relevant here: (1) "aliens who have serious medical conditions in which continued detention would not be appropriate," and (2) "aliens whose continued detention is not in the public interest." 8 C.F.R. § 212.5(b)(1), (5).

reviewing DHS's custody decisions. 8 C.F.R. § 1003.19(h)(2)(i)(B) ("[A]n immigration judge may not redetermine conditions of custody imposed by the Service with respect to . . . [a]rriving aliens in removal proceedings . . . ."); *see In Re X–K–*, 23 I. & N. Dec. 731, 732 (B.I.A. 2005). Moreover, as discussed above, federal judges are prohibited by statute from "set[ting] aside any action or decision by [DHS] regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole." 8 U.S.C. § 1226(e). Thus, unless an arriving alien is granted parole, the statute contemplates that she will remain in detention until she either receives legal status or is deported. *See* 8 U.S.C. § 1225(b)(1)(B)(ii).

### c.   Limited Due Process Protection for Arriving Aliens

The text of the Fifth Amendment does not distinguish among citizens and noncitizens; rather, it provides that no "person" may be deprived of life, liberty, or property without due process of law. U.S. Const. amend. V. Generally, therefore, noncitizens are accorded the full panoply of due process rights. *See Zadvydas*, 533 U.S. at 693 ("[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."). However, federal immigration statutes have long maintained a distinction between aliens who have been inspected and admitted—known as "deportable" or "removable" aliens—and those seeking initial entry—known as "inadmissible" aliens. *Id.*; *see Plyler v. Doe*, 457 U.S. 202, 212 n.12 (1982) (observing "the longstanding distinction between exclusion proceedings, involving the determination of admissibility, and deportation proceedings"). Even if they are detained within the United States for months or years, asylum-seekers like Petitioner fall within the inadmissible-alien category.

It is well-established that deportable aliens in removal proceedings are entitled to full constitutional due process. *See Demore*, 538 U.S. at 523; *Reno v. Flores*, 507 U.S. 292, 306

(1993). Moreover, in two cases decided in the early 2000s, the Supreme Court established that indefinite civil detention without an individualized bond determination violates deportable aliens' due process rights. *Zadvydas*, 533 U.S. at 692–93; *Demore v. Kim*, 538 U.S. 510, 531 (2003). Although the Court recognized that detention is a valid feature of the immigration system, it held that, after the expiration of a "presumptively reasonable period of detention," which the Court set at six months, an alien is entitled to an individualized parole determination. *Zadvydas*, 533 U.S. at 701.

Unfortunately, this precedent does not resolve Petitioner's claims because constitutional principles affecting removable aliens often do not extend to inadmissible aliens. The "entry fiction" that distinguishes removable from inadmissible aliens provides that "an alien stopped at the border is considered to remain at the border even if he is paroled into the country" or placed in immigration detention, "and is treated as such for the purpose of determining his rights to relief." *Otis V.*, 2018 WL 3302997, at *6. No matter how long he spends in immigration detention or even on parole, an alien who has not been formally admitted is treated by the law as if he were physically outside American territory and is therefore "entitled to something less than the full panoply of rights usually conferred by the Due Process Clause." *Id.*; *see* 8 U.S.C. § 1182(d)(5)(A) ("[P]arole of [an arriving] alien shall not be regarded as an admission of the alien.").

Because the entry fiction precludes courts from transplanting the *Zadvydas* principle into the inadmissible-alien context, the extent of inadmissible aliens' due process rights remains unsettled. *Pierre*, 350 F. Supp. 3d at 331 (Because "the Supreme Court . . . has [not] addressed whether due process requires a detainee, being held pursuant to § 1225(b), to receive a bond hearing following a certain period of detention, . . . this Constitutional issue remains expressly

undecided."); *see Castro v. Cabrera*, 742 F.3d 595, 599–600, 600 n.9 (5th Cir. 2014). Neither the Supreme Court nor the Fifth Circuit has decided whether *Zadvydas* has any bearing on asylum-seekers detained under 8 U.S.C. Section 1225(b)(1). To the contrary, in the early cases on which Respondents rely, the Supreme Court suggested that inadmissible aliens possess *no* rights beyond those provided by statute. In *Shaughnessy v. United States ex rel. Mezei*, for example, the Court determined that an alien permanently excluded from the United States on national-security grounds could be detained indefinitely on Ellis Island even though authorities had failed to effect his removal for several years. 345 U.S. 206, 215–16 (1953). Although resident aliens possess full due process rights, the Court concluded, "an alien on the threshold of initial entry" is entitled only to "[w]hatever the procedure authorized by Congress is." *Id.* at 212.

However, more recent cases appear to have abrogated this bright-line rule. In *Zadvydas*, for example, the Court did not distinguish among classes of aliens when it stated that a "statute permitting indefinite detention of an alien would raise a serious constitutional problem." 533 U.S. at 690. Since *Zadvydas*, at least two circuit courts have concluded or implied that indefinite detention of inadmissible aliens poses the same constitutional concerns as that of deportable aliens. *See Castro v. United States Dep't of Homeland Sec.*, 835 F.3d 422, 449 n.32 (3d Cir. 2016) ("We doubt . . . that Congress could authorize, or that the Executive could engage in, the indefinite, hearingless detention of an alien simply because the alien was apprehended shortly after clandestine entrance."); *Rosales-Garcia v. Holland*, 322 F.3d 386, 412 (6th Cir. 2003) ("[W]e do not see how we could conclude that the indefinite and potentially permanent detention of [inadmissible aliens whose parole was revoked] raises any less serious constitutional concerns than the indefinite and potentially permanent detention of the aliens in *Zadvydas*.").[12]

---

[12] The Ninth Circuit has reached the more limited holding that "the entry fiction does not

District courts considering inadmissible aliens' challenges to prolonged detention remain split. The Middle District of Louisiana, for example, has read *Zadvydas* and its progenitors strictly to conclude, as Respondents would have us do here, that "the INA authorizes the continued detention of excludable aliens who are only entitled to due process protection as provided by Congress." *Fernandez-Fajardo v. I.N.S.*, 193 F. Supp. 2d 877, 887 (M.D. La. 2001); *see also Aracely*, 319 F. Supp. 3d at 144 ("[T]he Court is not persuaded that [arriving alien] Plaintiffs are likely to successfully argue that they have a due process right to individualized bond hearings before immigration judges."). (*See* Dkt. 17 at 14.)

However, more recent cases tend to accord inadmissible aliens—and especially asylum-seekers like Petitioner—broader due process rights. Although the Supreme Court has made clear that "inadmissible aliens are entitled to *less* due process than are resident aliens," these courts have concluded that inadmissible aliens do have a right to be free from prolonged detention that no longer serves its stated purpose. *Maldonado*, 150 F. Supp. at 799; *see Ahad v. Lowe*, 235 F. Supp. 3d 676, 687–88 (M.D. Pa. 2017), *appeal filed* (Given the "rising sea of case law acknowledg[ing] the historic development of due process jurisprudence [and] consistently determin[ing] that detained aliens are entitled to some essential measure of due process in the form of a bond hearing once their detention reaches an unreasonable duration . . . [,] it would be anomalous to completely deny this modest measure of due process to detainees held pursuant

---

preclude non-admitted aliens . . . from coming within the ambit of the equal protection component of the Due Process Clause." *Kwai Fun Wong v. United States*, 373 F.3d 952, 974 (9th Cir. 2004). In addition, on remand from the Supreme Court in *Rodriguez*, the Ninth Circuit expressed "grave doubts that any statute that allows for arbitrary prolonged detention without any process is constitutional or that those who founded our democracy precisely to protect against the government's arbitrary deprivation of liberty would have thought so." *Rodriguez v. Marin*, 909 F.3d 252, 256 (9th Cir. 2018). However, the appeals court did not decide the constitutional issue, instead remanding to the district court, where the case is now pending once more. *Id.* at 257.

to § 1225(b).").

The Middle District of Pennsylvania, for example, has held in multiple cases, including several brought by asylum-seekers with pending BIA appeals, that inadmissible aliens are entitled to individualized bond hearings once their detention becomes unreasonably prolonged. *See, e.g.*, *Pierre*, 350 F. Supp. 3d at 332–33; *Ahad*, 235 F. Supp. 3d at 688; *see also Destine v. Doll*, 2018 WL 3584695, at *3–4 (M.D. Pa. July 26, 2018) (Arriving-alien "detainees enjoy the same basic due process right afforded to many other classes of detained aliens; that is, the right to an individualized bond determination once the length of their removal detention has become unreasonable.").

In a habeas case brought by an asylum-seeker who, like Petitioner, had been detained for just over a year, the Southern District of New York likewise ordered immigration authorities to hold "an individualized bond hearing during which the Government must prove by clear and convincing evidence that his continued detention is justified." *Lett v. Decker*, 346 F. Supp. 3d 379, 384 (S.D.N.Y. Oct. 10, 2018), *appeal filed*. Without determining the precise contours of arriving aliens' Fifth Amendment rights, the court held that, at the very least, they are entitled to "Due Process protections relating to their prolonged detention." *Id.* at 385.

The Southern District of New York distinguished *Mezei* on the grounds that (1) as a factual matter, Mezei had no right to further proceedings because he had already been permanently excluded from the United States, and (2) "the *Mezei* Court explicitly tailored its holding to the national security context, acknowledging that an exclusion proceeding grounded on danger to the national security presents different considerations than a typical deportation proceeding." *Id.* at 386 (internal alterations and quotation marks omitted); *see Mezei*, 345 U.S. at 207, 210–12. In *Lett*, as here, the Government respondents had not alleged that the petitioner

posed a threat to national security. Finally, the District of New Jersey has also recognized that prolonged detention under Section 1225(b) can violate inadmissible aliens' due process rights, although it concluded that "detention of just over a year is normally insufficient to render detention . . . constitutionally suspect." *Otis V.*, 2018 WL 3302997, at *8.

### 2. Analysis

Petitioner argues that regardless of what the statutes and regulations may provide, "prolonged detention without an individualized determination and review is . . . prohibited" by the Due Process Clause of the Fifth Amendment. (Dkt. 2 at 17.) Respondents counter that Petitioner's "claim must be dismissed because her allegations fail to rise to the standard of a due process violation." (Dkt. 17 at 13.) In their view, Petitioner cannot identify any government action depriving her of liberty because "her continued detention is attributable only to her challenges to the lawfulness of her removal order." (*Id.* at 15.) That is, if Petitioner had not chosen to appeal to the BIA, she would already have been released and deported. Respondents also characterize Petitioner's assertion that her detention is likely to last many more months as mere "speculation about future events insufficient to state a claim" for relief. (*Id.* at 15.) Moreover, Respondents maintain that "the due process rights of aliens are determined by the procedures established by Congress and the decisions of executive or administrative officers." (*Id.* at 14.) In other words, they argue, the text of the immigration statutes and DHS regulations are the final word on all aliens' rights and remedies.

Respondents are plainly mistaken about the reach of the Due Process Clause. As discussed above, the Supreme Court has repeatedly held that admitted aliens possess due process rights that supersede any contradictory statutory provisions. *See Zadvydas*, 533 U.S. at 695 (Congress's "plenary power" over immigration "is subject to important constitutional

limitations."). The open question is whether *arriving* aliens are entitled to the same due process protections as aliens who have become deportable after being admitted to the United States. *See Rodriguez*, 138 S. Ct. at 851.

Having considered the case law,  "the Court agrees with the weight of authority finding that arriving aliens detained pre-removal pursuant to § 1225(b) have a due process right to an individualized bond consideration once it is determined that the duration of their detention has become unreasonable." *Pierre*, 350 F. Supp. 3d at 332; *see Ahad*, 235 F. Supp. 3d at 682–86. The same concerns that underlay *Zadvydas* apply to detained asylum-seekers. Just like a deportable resident alien, Petitioner has a fundamental interest in her physical liberty that warrants "strong procedural protections." *Zadvydas*, 533 U.S. at 691; *see Lett*, 346 F. Supp. 3d at 386 ("[W]hen it comes to prolonged detention, the Court sees no logical reason to treat individuals at the threshold of entry seeking asylum under § 1225(b), like Petitioner, differently than other classes of detained aliens."). The Government, by contrast, has no legitimate interest in detaining aliens without a hearing "where detention's goal is no longer practically attainable." *Zadvydas*, 533 U.S. at 690.

The only remaining question is whether the duration of Petitioner's detention has in fact become unreasonable. To make that determination, the Court adopts the three-pronged test used by the Southern District of New York in several post-*Rodriguez* immigration habeas cases. *See Lett*, 346 F. Supp. 3d at 387. The Court must examine: "(1) the length of time Petitioner has already been detained; (2) whether Petitioner is responsible for the delay; and (3) whether Petitioner has asserted defenses to removal." *Perez*, 2018 WL 3991497, at *4 (citing *Sajous v. Decker*, 2018 WL 2357266, at *10–11 (S.D.N.Y. May 23, 2018)).

First, Petitioner has been detained for just over a year—since her arrival at the Laredo

point of entry on March 21, 2018. (Dkt. 2 at 9.) Although one district court has concluded that a one-year detention is not unreasonable barring exceptional circumstances, *Otis V.*, 2018 WL 3302997, at *8, the Supreme Court held in *Zadvydas* that detention of more than six months entitles a removable alien to an individualized bond hearing, 533 U.S. at 701. Moreover, absent parole, Petitioner's detention is likely to last many more months as she waits for determinations from the BIA and, potentially, the Fifth Circuit. (*See* Dkt. 2 at 12.) This Court therefore joins the numerous other district courts that have found Section 1225(b) detention lasting more than one year unreasonable. *See, e.g.*, *Ahad*, 235 F. Supp. 3d at 685–86; *Perez*, 2018 WL 3991497, at *5; *Birch v. Decker*, 2018 WL 794618, at *6–7 (S.D.N.Y. Feb. 7, 2018), *appeal filed*; *Singh v. Sabol*, 2017 WL 1659029, at *4 (M.D. Pa. Apr. 6, 2017), *report and recommendation adopted*, 2017 WL 1541847 (M.D. Pa. Apr. 28, 2017).

Second, the Court finds that the Government is responsible for the bulk of the delay in Petitioner's case. DHS waited several weeks after Petitioner's arrival to conduct her credible fear interview (*see* Dkt. 3, Attach. 2) and another two weeks to serve her with the results of that interview (*see* Dkt. 2 at 10). DHS then waited another month before filing a Notice to Appear with the immigration court. (*See id.*; Dkt. 3, Attach. 4.) Respondents contend that Petitioner is responsible for her continued custody because, had she "chosen not to appeal the Immigration Judge's removal order, she would not be detained, but instead removed from the country." (Dkt. 17 at 15.) This is a rather cynical interpretation of the choices available to an asylum-seeker alleging a threat of murder if returned to her home country. (Dkt. 3, Attach. 2 at 9.) Even if we were to accept Respondents' argument, though, it would merely counterbalance DHS's own delays and render this second factor neutral.

Finally, it is undisputed that Petitioner has asserted a defense to removal in her asylum

application. (*See* Dkt. 3, Attach. 7.) At this stage, the Court may not inquire into the merits of Petitioner's application. Rather, "it is sufficient to note [its] existence and the resulting possibility that the Petitioner will ultimately not be removed, which diminishes the ultimate purpose of detaining the Petitioner pending a final determination as to whether [s]he is removable." *Lett*, 346 F. Supp. 3d at 388.

Given these findings, the Court holds that the duration of Petitioner's detention has become unreasonable. Although Petitioner seeks an order granting her immediate release, the Court finds that "a bond hearing before an immigration judge is more appropriate . . . because an immigration judge is in a better position to conduct the sort of individualized review that is necessary to determine if Petitioner should be released during the pendency of [her] asylum case." *Maldonado*, 150 F. Supp. 3d at 812; *see Pierre*, 350 F. Supp. 3d at 333. Moreover, while there is scant case law supporting a grant of immediate release, "[s]ettled case law has long acknowledged that the power to set bail in habeas proceedings is a legal and logical concomitant of the court's habeas corpus jurisdiction." *Ahad*, 235 F. Supp. 3d at 689; *see Mapp v. Reno*, 241 F.3d 221, 225–26 (2d Cir. 2001).

Stopping short of its authority to set bail of its own accord, the Court will order Respondent Perez to hold an individualized bond determination before an IJ within fourteen days of this Order. At the hearing, DHS will bear the burden of showing that continued detention is necessary to accomplish the objectives identified by Respondents—namely, determination of Petitioner's identity and assurance of Petitioner's appearance for subsequent proceedings.

## <u>Conclusion</u>

For the foregoing reasons, Petitioner's habeas petition (Dkt. 2) is hereby GRANTED IN PART insofar as it seeks an individualized hearing before an immigration judge. Respondent is

hereby ORDERED to hold an individualized custody review before an immigration judge within 14 days of the issuance of this Order. If a hearing is not held within 14 days, Respondent must release Petitioner under reasonable conditions of supervision.

Respondents' motion to dismiss the non-warden Respondents (Dkt. 17 at 18) is hereby GRANTED. The Clerk of Court is directed to TERMINATE Nielsen, Bible, Cerna, Vitiello, and Whitaker as parties to this case, leaving Orlando Perez as the sole Respondent.

Respondents' motion to dismiss Petitioner's habeas petition (Dkt. 17 at 7–18) is hereby DENIED.

Finally, Petitioner's "Motion for Leave to File a Sur-Reply" (Dkt. 20) is hereby DENIED as MOOT.

IT IS SO ORDERED.

SIGNED this 29th day of March, 2019.

_____
Diana Saldaña
United States District Judge